## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**SHEILA FAWN STOVER,**

     **Plaintiff,**

**vs.**                         **CIVIL ACTION NO. 5:19-CV-00062**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

       This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered January 28, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Complaint and Motion for Remand and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16)

       Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 15), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Sheila Fawn Stover, (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on June 16, 2014 alleging disability as of June 12, 2014 because of "cognitive memory loss, loss of both short term and long term memory, PTSD, depression and anxiety."[1] (Tr. at 220-211, 241, 242) Her claim was initially denied on October 22, 2014 (Tr. at 171-175) and again upon reconsideration on February 3, 2015. (Tr. at 179-185) Thereafter, Claimant filed a written request for a hearing on February 26, 2015. (Tr. at 186-187)

An administrative hearing was held on July 31, 2017 before the Honorable Michelle Wolfe, Administrative Law Judge ("ALJ"). (Tr. at 112-141) On January 3, 2018, the ALJ entered an unfavorable decision. (Tr. at 8-31) On January 17, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 218-219) The ALJ's decision became the final decision of the Commissioner on December 14, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On January 25, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 12, 13) Subsequently, Claimant filed a Brief in Support of Complaint and Motion for Remand (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16), to which Claimant filed her Reply (ECF No. 17).

---

[1] In her Disability Report – Appeal, submitted on November 5, 2014, Claimant alleged that her memory was "much worse" and she had to start writing down conversations to recall them and to using a timer for cooking and even had her niece help her pay her bills. (Tr. at 266) In her Disability Report – Appeal submitted on March 3, 2015, Claimant asserted that she began experiencing increased mood swings, as well as increased symptoms from anxiety, depression and panic attacks and that she was having increased pain in her shoulders with decreased range of motion. (Tr. at 296) She further alleged that she had crying spells, feelings of isolation, racing thoughts and problems concentrating. (Id.)

Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 47 years old as of the alleged onset date, a "younger person", but then changed age categories to a "person closely approaching advanced age" when the ALJ issued the unfavorable decision. See 20 C.F.R. § 404.1563(c), (d). (Tr. at 22) Claimant earned a Master's degree in education and had worked as a special education teacher for over 15 years. (Tr. at 117, 119, 242, 243)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2019. (Tr. at 13, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of June 12, 2014. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: left shoulder impingement and rotator cuff tear; residual effects open acromioplasty; CA ligament resection and exploration repair of rotator cuff; left should adhesive capsulitis; right shoulder impingement and arthropathy; myalgia; cervical degenerative disc disease; generalized anxiety disorder; posttraumatic stress disorder; dysthymic disorder; major depressive disorder; and cognitive disorder. (Tr. at 13-14, Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except no more than occasional pushing/pulling with the upper extremities. The claimant is limited to no more than occasional overhead reaching. The claimant is limited to no more than frequent balancing and stooping. The claimant is limited to no more than occasional crouching, crawling, kneeling, or climbing but never on ladders/ropes/scaffolds. The claimant must avoid concentrated exposure to temperature extremes of cold/heat, vibrations, and hazards including moving machinery and unprotected heights. The claimant is limited to simple, routine tasks, but no complex tasks, in a low stress work environment defined as occasional decision-making and occasional changes in work setting. The claimant is limited to

no more than occasional interaction with the public, co-workers, and supervisors.

(Tr. at 16, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing her past relevant work. (Tr. at 22, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from June 12, 2014 through the date of the decision. (Tr. at 23, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's RFC assessment is inconsistent with the jobs identified by the vocational expert in accordance to the descriptions for them provided by the Dictionary of Occupational Titles ("DOT"). (ECF No. 15 at 3-5) Specifically, two of the jobs identified, "sales attendant" and hand packer, require greater physical exertion than what the ALJ found Claimant can still perform as the RFC limits her to "light work." (Id. at 4) The other job identified, "assembler", may involve more than the "occasional" reaching beyond Claimant's RFC limitation; Claimant explains that courts in other Circuits have interpreted the DOT description as having required greater than occasional reaching, such as frequent or constant. (Id. at 5) Another problem is that the DOT provides that the "assembler" position requires the use of machines that appears inconsistent with Claimant's RFC to the extent that she is to avoid moving machinery. (Id. at 6) Finally, the vocational expert did not provide the number of these jobs regionally, only nationally. (Id.) Claimant requests this Court to remand to correct these errors. (Id.)

In response, the Commissioner asserts that the ALJ posed an appropriate hypothetical to

the vocational expert and is permitted to rely upon not only the DOT but also the vocational expert's testimony to determine if there were other jobs Claimant could still perform. (ECF No. 16 at 10-11) The vocational expert specifically testified about the DOT classifications for sedentary, light, and medium work in both the "assembler" and "packager hand" positions and explained that based on his observation and experience identified those jobs from the DOT and further testified his testimony was consistent with the controlling RFC. (Id. at 11) Since an ALJ may rely upon a vocational expert's experience in job placement or career counseling pursuant to Social Security Ruling ("SSR") 00-4p rather than the DOT, Claimant's argument fails. (Id. at 11-12) The vocational expert identified one or more occupations in the national economy that Claimant could still perform which complies with 20 C.F.R. § 404.1566. (Id. at 12) The Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id.)

In reply, Claimant reasserts that the ALJ's decision contains inconsistencies between the controlling RFC and the jobs identified by the vocational expert that Claimant can still perform. (ECF No. 17 at 1-2) Claimant points out that the ALJ did not carry her burden at the fifth step because there is no clear answer as to how she arrived at her determination that Claimant could perform the duties of any of the jobs identified, particularly the "assembler" job with respect to her limitations in reaching, moving machinery, and the significant number of these jobs in the national economy. (Id. at 2-5) Specifically, Claimant reiterates that this job involves machinery, which conflicts with the RFC that she is to avoid machinery; further, the ALJ "lumps all three" jobs identified by the vocational expert as the available number of jobs ranging from 15,000 to 40,000 nationally, which is ambiguous because it is unclear if this includes regional numbers. (Id.)

Finally, Claimant points out that the DOT number for this job was last updated in 1981, which underscores the uncertainty of the ALJ's unfavorable decision. (Id. at 5) Claimant again asks for remand. (Id.)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Claimant's Medical Treatment Records:

In January 2014, Claimant went to Steven E. Vess, D.O. with complaints of left shoulder pain. (Tr. at 403) She reported that in November 2013 she went bow hunting and loaded a deer on her own. (Id.) Shortly thereafter, she experienced left shoulder pain, which was exacerbated with overhead activity and caused her to wake up during the night. (Id.) Her pain improved following a steroid injection, but returned approximately three months later. (Tr. at 404) She received another injection, and the pain returned approximately one month later. (Tr. at 404-405) She underwent left rotator cuff repair surgery in June 2014 (Tr. at 346-347, 408-409), and her symptoms began to improve within a week of surgery (Tr. at 410).[3] On July 2, 2014, Dr. Vess opined that Claimant made excellent progress, and she agreed. (Tr. at 411) In September 2014, Dr. Hess observed weakness in abduction. (Tr. at 444)

On June 2, 2014, Claimant presented to Debra Crites-Sams, D.O., with a history of memory loss and requested a "letter written for employment" (Tr. at 364) Claimant also stated that she would pursue Social Security benefits. (Id.) Dr. Crites-Sams described Claimant as pleasant and

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

[3] This treatment note is dated June 12, 2014, the alleged onset date; Dr. Vess indicated that if Claimant "does not work with that left side, I can give her a return to work and I will give her a note stating that." (Tr. at 410)

in no apparent distress, and noted that she exhibited full orientation and a normal mood and affect. (Id.) She recorded normal examination findings and diagnosed short term memory issues and stress disorder. (Id.) In July 2014, Dr. Crites-Sams noted that Claimant was "easily angered and very upset," but she recorded normal examination findings and prescribed Ritalin. (Tr. at 363) In August 2014, Claimant complained of moodiness. (Tr. at 362) Dr. Crites-Sams described Claimant's mood and affect as "moody," recorded otherwise normal examination findings, and discontinued Claimant's prescription for Ritalin. (Id.)

In November 2014, March 2015, April 2015, June 2015, September 2015, January 2016, April 2017, Dr. Crites-Sams recorded normal examination findings. (Tr. at 526, 528, 530, 533, 552, 596, 636-637) In April 2016, Dr. Crites-Sams observed positive Tinel's and Phalen's signs in Claimant's upper extremities. (Tr. at 594) In July 2016, Dr. Crites-Sams observed numbness and joint pain in Claimant's upper extremities. (Tr. at 592) An EMG revealed normal results. (Tr. at 646-647) In November 2016, Dr. Crites-Sams observed evidence of right shoulder pain. (Tr. at 640-641) An MRI of Claimant's cervical spine revealed cervical spondylosis without neural compromise. (Tr. at 644) In January 2017, Dr. Crites-Sams observed edema in Claimant's left ankle. (Tr. at 638) An MRI revealed normal results. (Tr. at 643)

In December 2014 and March 2016, Dr. Crites-Sams completed paperwork associated with Claimant's disability application to the West Virginia Consolidated Public Retirement Board, Teachers' Retirement System and opined that Claimant was permanently incapacitated from returning to her job as a teacher due to short term memory loss, depression, and anxiety. (Tr. at 655, 663)

On August 22, 2014, Lester Sargent, M.A., conducted a neuropsychological screening for

purposes of providing appropriate mental health diagnoses and assessing residual neurological effects of a head injury from a motor vehicle accident occurring in 2009. (Tr. at 413-430) Claimant reported that in 2000, she witnessed the death of a man after a hunting accident. (Tr. at 414) She also reported a history of concussion following a 2009 motor vehicle accident. (Id.) With respect to her daily activities, Claimant reported that she cared for her personal needs without assistance, performed household chores, prepared meals, cared for her pets, visited family, and kept scheduled appointments. (Tr. at 419)

Testing revealed cognitive decline, especially in the areas of recalling previously learned information and processing speed. (Tr. at 414) Mr. Sargent diagnosed cognitive disorder, generalized anxiety disorder, PTSD, and major depressive disorder, and recommended that Claimant utilize memory aides, relaxation techniques, and visual imagery; maintain a regular exercise program; and attend counseling sessions. (Tr. at 418, 420) He opined that Claimant's ability to resume gainful employment was "poor." (Tr. at 420)

In December 2014, Noel Jewell, M.D., recorded normal mental status examination findings, including that Claimant was alert and oriented and exhibited fluent, non-pressured speech, grossly intact recent and remote memory, satisfactory attention and concentration, appropriate language, good fund of information, liner and logical thought processes, no evidence of hallucinations, a dysthymic mood, and good insight and judgment. (Tr. at 466) He diagnosed PTSD, major depressive disorder, and generalized anxiety disorder. (Id.) He recorded similar normal findings in January 2015. (Tr. at 474)

In February 2015, Kendall Wilson, Jr., D.O., examined Claimant for the West Virginia Teachers Retirement System and opined that Claimant was totally and permanently incapacitated

and unable to perform her job duties due to short term memory loss, depression, anxiety, and PTSD. (Tr. at 657-662)

In February 2015 and March 2015, Dr. Jewell observed that Claimant exhibited a depressed or anxious mood, but recorded otherwise normal findings. (Tr. at 507, 510-511, 514-515, 517-518) Claimant's mood remained depressed or anxious through July 2017, but Dr. Jewell recorded otherwise normal examination findings. (Tr. at 540-551, 555-556, 560-561, 563-564, 568-569, 572-573, 576, 603-604, 606-607, 610-611, 618-619, 622-623, 625-626, 630-631, 666-667, 669-670) He specifically noted that Claimant had no memory impairment. (Tr. at 507, 511, 514, 517, 540, 555, 560, 563, 568, 572, 576, 604, 606, 610, 613, 618, 622, 626, 630, 666, 669)

In April 2015, Claimant complained of bilateral shoulder pain which was worse on the left side. (Tr. at 521) Ross Parker Smith, M.D., diagnosed left shoulder adhesive capsulitis and right shoulder impingement and arthropathy. (Tr. at 522)

In February and March 2016, Dr. Jewell opined that Claimant "has been doing well." (Tr. at 576, 603). In June 2017, Claimant reported that she was doing better and spending time with her family, including helping her brother-in-law, who has multiple sclerosis. (Tr. at 666) In July 2017, Claimant reported that she was getting out and spending time in the woods, which she found therapeutic. (Tr. at 669)

State Agency Consultant Opinions:

In October 2014, state agency psychologist John Todd, Ph.D., reviewed the record and opined that Claimant's mental impairments caused mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended

duration. (Tr. at 148) Dr. Todd also completed a mental RFC assessment, in which he opined that Claimant had no significant limitations in remembering locations and work-like procedures and understanding and remembering very short and simple instructions. (Tr. at 149)

He opined that she had no limitations in sustained concentration and persistence, social interaction, and adaptation, and she could learn and perform simple, routine, two-three step tasks (Tr. at 149-150)

In January 2015, state agency psychologist Paula Bickham, Ph.D., reviewed the updated record and concurred with Dr. Todd's opinion. (Tr. at 163, 166-167)

In February 2015, state agency physician Pedro Lo, M.D., reviewed the record and opined that Claimant retained the ability to lift and/or carry twenty-five pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; occasionally perform postural activities; and she should avoid concentrated exposure to extreme cold and heat and hazards. (Tr. at 165-166)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she lived in a house alone, has no children and was never married. (Tr. at 117-118) She explained that she stopped working in June 2014 because she couldn't do her job: she could no longer write lesson plans or complete an Individualized Education Plan ("IEP") despite having done them for about fifteen years prior. (Tr. at 119) She testified that she could not return to any type of work because she can't remember much of anything and she has a lot of difficulty concentrating and staying on task. (Tr. at 120)

Claimant testified that she wakes in the morning between 5:30 and 7:30 and will eat simple, meals for breakfast, lunch and dinner. (Tr. at 121) She said she must use a timer when she cooks because she'll walk off and forget that she was cooking something. (Tr. at 122) She often forgets to take her laundry out of the wash until she smells the mildew a few days later. (Id.) She shops for groceries herself but has to make a list because she will forget something, she stated that she hates shopping or going out because when she runs into people she may know from school, she forgets who they are. (Id.) Although she drove to the hearing, she needed her sister to read off the directions because she can't remember where to go or where she parked. (Tr. at 127) She has her niece help with her checkbook to make sure she pays her bills properly. (Id.) Claimant testified that since she stopped working, her memory has gotten worse. (Id.)

Claimant testified that she has no friends, but spends time with her sister. (Tr. at 123) She uses Facebook to see what her out of state relatives are doing. (Id.) She reads without difficulty but will forget what she had read or where she left off. (Tr. at 124) Besides riding a lawn mower, she does not do other outdoor activities or much exercise. (Id.) Claimant testified that she doesn't do much of anything, even shower, she explained that she doesn't like to shower or wash her hair or do anything other than feed her cats and dog which she does on a daily basis. (Tr. at 125-126)

Claimant stated that both of her shoulders hurt when she does anything like riding the lawn mower. (Tr. at 123) She explained that both rotator cuffs were torn, but did not have surgery for the right shoulder and is weaker in her left hand and gives her greater trouble when lifting something such as a gallon of milk. (Id.) Claimant testified that it takes her about an hour or two to mow her lawn and afterwards her hands swell and ache during the night and that it lasts for three

or four days. (Tr. at 129) She can kneel, but getting up is difficult and will need something to help pull herself up. (Id.)

Claimant testified that she could not do a job that required simple routine tasks because she can't remember or concentrate; she can interact with the public but doesn't like to and she doesn't like people because they make her angry. (Tr. at 127-128) However, since she was in the ninth grade she wanted to be a teacher and she loved teaching. (Tr. at 130)

Gerald W. Keating, Vocational Expert ("VE") Testimony:

The ALJ asked the VE whether jobs existed for an individual of Claimant's age, education, and work background, who could perform light work involving occasional pushing/pulling with the upper extremities; occasional overhead reaching; frequent balancing and stooping; occasional kneeling, crouching, crawling or climbing, but never on ladders, ropes or scaffolds; no concentrated exposure to temperature extremes of cold/heat, vibrations, and hazards, including moving machinery and unprotected heights. (Tr. at 134-135) In addition, the ALJ limited the hypothetical individual to simple, routine tasks; no complex tasks; a low stress environment, defined as occasional decision-making and occasional changes in the work setting; and occasional interaction with the public, coworkers, and supervisors. (Id.) The VE testified that a person with such a background and limitations could perform jobs existing in significant numbers in the national economy, such as the light, unskilled occupations of stock checker that does apparel, small products assembler, and hand packer (Tr. 136).

The ALJ then asked,

"And is your testimony consistent with the Dictionary of Occupational Titles, except for the following. The pushing and pulling and the overhead reaching and the off task. And those are based upon observation and experience, as well, since the DOT doesn't specifically provide for them. And as well, the packer and the

assembly positions noted either at the – for the light at the packer and the assembly at the sedentary. And if you could further provide comment on those?"

(Tr. at 139) The VE responded,

"Sure, your honor. The assembler small products, <u>DOT</u> has two classifications in there, or two definitions in <u>DOT</u> codes. And those are the only two and they pretty much cover the gambit of how small parts assembly is performed from a standardization standpoint. It generally is bench type work. And whether it's sedentary or light, again at bench type, I used the same code. Again, it's a good descriptor of how small parts are assembled and it gives a snapshot of items. In Assembler I, it gives a snapshot of items that are assembled. It's not an exhausted list. And number 2, or it might even be vice-versa, it gives a number of the industries that all parts assembly is performed in. So it is a good descriptor, but it is the only descriptor I have for small parts assembly. So I used that whether – I use that code, those codes, for whether it's sedentary or light. In the same vein as packager hand in the industry. The <u>DOT</u> only recognizes one code in the <u>DOT</u> nationally listed as medium. Reason behind that is it addresses the end process of preparing products for shipment in which material handlers will remove bolt packaging skids with automatic equipment. Now prior to that state, you have small items or lighter items that are being packaged by hand, manually, and again, generally, that is bench type work. So, it is the only descriptor I have in the <u>DOT</u> that addresses the manual aspect of packaging and that's how I used that."

(Tr. at 139-140)

## <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

16

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

DOT Consistency at the Fifth Step of Sequential Evaluation Process:

At the final step in the sequential evaluation process, the ALJ determined that Claimant could perform light work with additional limitations. (Tr. at 23) The ALJ noted the vocational expert testified that there were several jobs which Claimant could still perform: "store checker" (DOT #299.677-014); "assembler" (DOT #739.687-030); and "hand packer" (DOT #920.587-018), which are "available in numbers ranging from at least 15,000 to 40,000 nationally." (Id.) The ALJ then determined that pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the DOT, "with the exception of the vocational expert's testimony as to pushing/pulling, overhead reaching, and off-task allowances which he testified on based upon his experience." (Id.)

> The Fourth Circuit has held "Although we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert ..." Pearson v. Colvin, 810 F.3d 204, 211 (4th Cir. 2015). The duty rests with the ALJ, not a reviewing court, to find facts and resolve conflicts. Radford, 734 F.3d at 296; see also Brown v. Colvin, 639 Fed. App'x. 921, 923, 2016 WL 50298, at *2 (4th Cir. Feb. 9, 2016) ("We remand to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review"). And, as the Fourth Circuit has repeatedly made clear, the ALJ must provide a sufficient explanation of his findings to allow for meaningful appellate review. See Mascio, 780 F.3d at 637 ("Because we are left to guess about how the ALJ arrived at his conclusion on [Plaintiff's] ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary."); Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir.

> 1986) (holding that without an adequate explanation, "it is simply impossible to tell whether there was substantial evidence to support the determination").

See, Cunningham v. Berryhill, No. 3:16-cv-02525, 2017 WL 1259587 (S.D.W. Va. Mar. 31, 2017) (J. Tinsley). The pertinent law clearly indicates that "[w]hen a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." See, Policy Interpretation Ruling: Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions, SSR 00-4p, 2000 WL 1898704, at *4. As stated supra, it remains the exclusive duty of the ALJ to identify any conflicts in the evidence and to resolve them. Indeed, the burden of proof shifts to the ALJ at the fifth step of the sequential evaluation process, because "[i]n order to support a finding that you are not disabled at this fifth step . . . we are responsible for providing evidence that demonstrates that other work exists . . . that you can do, given your residual functional capacity and vocational factors." See 20 C.F.R. § 404.1560(c)(2). In determining the existence of jobs that a claimant can perform, the ALJ will consider both the DOT and a vocational expert's testimony. See Id. § 404.1566. Indeed, SSR 00-4p expressly allows the ALJ to rely upon a vocational expert's "experience in job placement or career counseling" among reasonable bases for relying on the evidence from the vocational experts rather than the DOT. 2000 WL 1898704, at *2.

Returning to the jobs identified by the vocational expert, the DOT descriptions for the three jobs have "apparent" conflicts with the controlling RFC. For instance, the "store checker" job, DOT #299.677-014, titled "Sales Attendant, Building Materials" requires a strength level of "Heavy Work" obviously providing that the physical demand requirements "are in excess of those for Medium Work." See DICOT 299.677-014 (G.P.O.), 1991 WL 672644. The "hand packer" job,

DOT #920.587-018 titled "Packager, Hand" involves "Medium Work." See DICOT 920.587-018 (G.P.O.), 1991 WL 687916. The "assembler" job, DOT #739.687-030, titled "Assembler, Small Products II" involves "Light Work" however the "reaching" requirement is listed as "constantly." See DICOT 739.687-030 (G.P.O.), 1991 WL 680180.

With regard to the "assembler" and "hand packer" jobs, the vocational expert explicitly testified, *supra*, about the DOT descriptions for these jobs and explained that based on his observation and experience that the jobs identified did not conflict with the RFC limitation to light work and occasional pushing/pulling and overhead reaching. Further, although Claimant contends that the "assembler" job requires the use of machines, such as an arbor press, punch press, tap spot welding or riveters, and the controlling RFC specifically provides that Claimant is to avoid moving machinery as well as temperature extremes (ECF No. 15 at 6), the DOT also provides that "moving mechanical parts", "extreme cold", and "extreme heat" are "not present" in this position. See 1991 WL 680180. The ALJ also specifically noted these restrictions when she provided the controlling hypothetical to the vocational expert.

With regard to the "store checker"[4] position, despite the DOT description, *supra*, the vocational expert explicitly testified that this was a "light, unskilled" job that was consistent with Claimant's pulling/pushing with upper extremities as well as overhead reaching limitations. (Tr. at 135-136)

Finally, with respect to Claimant's contention that the vocational expert only listed jobs in the national economy or specify the number of jobs in the region (ECF No. 15 at 6; ECF No. 17 at 4-5), the Regulations specifically provide:

---

[4] The transcript from the administrative hearing indicates that the vocational expert identified this job as a "stock checker that does apparel." (Tr. at 136) The word "store" is likely due to scrivener's error.

> We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether –
>
> (1)   Work exists in the immediate area in which you live;
>
> (2)   A specific job vacancy exists for you; or
>
> (3)   You would be hired if you applied for work.

See 20 C.F.R. § 404.1566(a)(1)-(3). Additionally, "[w]ork exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." See Id. 404.1566(b) (emphasis added).

Claimant has argued that the "significant number of jobs" requirement is determined on a case-by-case basis; because neither the vocational expert nor the ALJ made any findings as to the number of these jobs in the regional economy in addition to the outdated DOT job numbers, the ALJ's fifth step findings are suspect.[5] (ECF No. 17 at 4-5) As demonstrated *supra*, SSR 00-4p provides that an ALJ may rely on a vocational expert's testimony where the DOT is unclear as to whether a claimant can perform a job. As pointed out by the Commissioner, that is exactly what the ALJ in this case did. (ECF No. 16 at 12) The vocational expert testified that with regard to the "stock checker that does apparel" which he classified as a light, unskilled job, there were 15,000 to 16,000 "as a baseline in the national economy." (Tr. at 136) With regard to the "assembler of small products", another light, unskilled job, the vocational expert testified there was "a baseline 40,000 to 41,000 in the national economy. (Id.) Finally, with regard to "a packer with his hand" in

---

[5] Claimant cites Smathers v. Comm'r of Soc. Sec., No. 2:14-cv-500, 2015 WL 5568324, at *3 (S.D. Ohio Sept. 22, 2015). The undersigned notes that in Smathers, the court determined that substantial evidence did not support the adjudicator's findings that the number of jobs, 300 regionally and 8,250 nationally, constitute a significant number because the record was ambiguous as to the number of available jobs because there was no clear determination from the vocational expert's testimony. Id. at *2 and 4. This is an important distinction from the case at bar because the record demonstrated that the claimant in Smathers could only perform a single job. Id. at *3.

"any industry", the vocational expert testified, "I'm going to offer it at light, unskilled . . . [t]hat is going to be 25,000 as a baseline in the national economy." (Id.) As shown by the vocational expert's testimony, the "significant number of jobs" were clearly demarcated for each of the three positions identified that Claimant could still perform despite her limitations. Thus, the ALJ's conclusion that these jobs were "available in numbers ranging from at least 15,000 to 40,000 nationally" (Tr. at 23) is supported by substantial evidence.

Accordingly, the undersigned **FINDS** that the ALJ met her burden of proof at the fifth step of the sequential evaluation and the ALJ's determination that the vocational expert's testimony was compliant with the DOT is supported by substantial evidence. In sum, the undersigned **FINDS** ALJ's unfavorable decision is supported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 15), **GRANT** the Defendant's request to affirm the decision below (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: June 6, 2019.

Omar J. Aboulhosn
United States Magistrate Judge